In re FIRST SOFTWARE
CORP., Debtor.

FIRST SOFTWARE CORP., by the
DISBURSING AGENT, Plaintiff,

v.

COMPUTER ASSOCIATES
INTERNATIONAL, INC.,
Defendant.

Civ. A. No. 88–886–WF.

United States District Court,
D. Massachusetts.

Nov. 17, 1989.

MEMORANDUM AND ORDER

WOLF, District Judge.

This is an appeal from the final judgment of the Bankruptcy Court. This matter originated when First Software Corporation ("Debtor") commenced an adversary proceeding in the Bankruptcy Court on May 20, 1986, against appellant, Computer Associates International, Inc. for the recovery of an allegedly preferential transfer of property (8,700 software programs) and

preferential transfers of money ($450,000). The transfers were made by the Debtor to Computer Associates within ninety days preceding the Debtor's filing of the petition in bankruptcy. The prosecution of the adversary complaint passed from the Debtor to David J. Ferrari, the Disbursing Agent who was appointed pursuant to First Software's plan of reorganization.

The complaint contains four counts. There are five issues on appeal. Count I, which has been waived by the Disbursing Agent, refers to a transfer of property (software programs) valued at $1,030. Count II refers to a transfer of software programs having an alleged value of $1,500,026. Counts III and IV refer to two payments made by certified checks in the amounts of $200,000 and $250,000, respectively. The Bankruptcy Judge ruled in favor of the Debtor on Count II (the software programs) in the amount of $1,500,026 and in favor of the Debtor on counts III and IV (money transfers) in the amount of $450,000 plus interest at the rate set forth in 28 U.S.C. 1961(a) from May 20, 1986. 84 B.R. 278.

Computer Associates argues on appeal with respect to the software programs that their transfer was not preferential as statutorily defined and, if it was, any right of First Software to recover money damages has been eliminated because upon receipt of the Complaint, Computer Associates offered to return the programs immediately. With regard to counts III and IV, Computer Associates argues that vital evidence was wrongly excluded.

Debtor cross appeals and argues that the Bankruptcy Court erred in declining to award prejudgment interest upon the value of the returned goods (software programs Count II).

For the reasons stated below the decision of the Bankruptcy Court is affirmed on all counts.

## I. *Prior Proceedings and Facts*

First Software filed its complaint against Computer Associates on May 20, 1986. A trial was held on October 19 and 20, 1987. In rendering its 25–page findings of fact and conclusions of law on March 15, 1988, the Bankruptcy Court considered 24 exhibits and the testimony of five witnesses. It found the facts as follows.

Debtor was a distributor of Computer Associates's software until 1986. In December of 1985, it was in arrears on its account with Computer Associates. Abraham Poznanski, the president of Computer Associates Micro Products division, testified that at the end of 1985 the Debtor owed Computer Associates between $800,000 and $1,000,000, an obligation stemming from an $800,000 sale in August, 1985, and still older accounts.

In a letter dated December 4, 1985, the Debtor advised Computer Associates that it had received "formal credit committee approval for a $25 million financing accommodation from Heller Financial Inc." and that, as a condition of consummation of Heller's financing arrangements with Debtor, Heller required that Computer Associates agree to Heller's senior lien and security interest in any inventory in which the vendor also might have a security interest, lien, right or claim. Computer Associates endorsed the agreement but, in an accompanying response and a follow up letter, outlined conditions of its own, "namely, that the Debtor would pay to us by no later than December 13, 1985 approximately $400,000 of its outstanding balance owed to us, and that the remaining amount of that balance would be paid to us on or before January 4, 1986."

Although First Software did not comply with these conditions, it did pay Computer Associates by check dated January 6, 1986 $587,979.07 toward its outstanding balance. Additionally, in mid–January, two First Software representatives, Michael Hajjar, who was the Debtor's president at the time and the person primarily responsible for purchasing, and Michael Kirwin, the Debtor's chief financial officer, traveled to California to meet with Poznanski and other Computer Associates personnel to discuss the purchase of additional products by First Software. By letter dated January 17, 1986, Computer Associates confirmed the agreement reached between the parties

in California for the purchase of $2,000,000 worth of software by First Software. The agreement set forth the following payment schedule:

| | | |
|---|---|---|
| February 15 | — | $750,000 |
| February 22 | — | $250,000 |
| April 15 | — | $750,000 |
| April 22 | — | $250,000 |

First Software was unable to adhere to Computer Associates' payment schedule. As a result of the Debtor's failure to abide by the payment terms, Poznanski initiated a telephone campaign to obtain payment. He testified that by the end of March he was exasperated with the principals of the Debtor and the excuses advanced for its inability or unwillingness to pay Computer Associates. Although the testimony of Poznanski and Rick Faulk, the Debtor's former chief executive officer and current president,[1] is somewhat contradictory, it is readily apparent that exchanges between Poznanski and the principals of the Debtor were heated. There is testimony by Poznanski of threats made by Computer Associates executives to sue the Debtor, to go to the trade press with revelations about First Software's dire financial condition and to commence an involuntary bankruptcy proceeding.

In response to mounting pressure by Computer Associates, the parties agreed that First Software would pay $450,000 to Computer Associates on the outstanding obligation and that First Software would return approximately $1,500,000 of Computer Associates's products in its inventory. Poznanski agreed to accept the return and the $450,000, provided the payment was made by certified check.

On March 21, 1986, a Friday, Computer Associates arranged for a truck to be at First Software's warehouse to pick up the inventory. However, First Software personnel sent the truck away. Upon being so advised, Poznanski admitted that he called First Software and threatened a law suit. The following Tuesday, First Software returned products to Computer Associates. In a credit memorandum dated March 28,

1986, First Software valued the returned products at $1,500,026. First Software also delivered a certified check to Computer Associates in the amount of $200,000. Shortly thereafter, on April 2, 1986, First Software delivered another certified check to Computer Associates in the amount of $250,000. Computer Associates segregated the products returned by First Software and, except for a retender of the products to First Software on May 24, 1986, it made no attempt to sell or dispose of the products. Poznanski testified that Computer Associates could have sold the returned products in April, 1986.

Less than three weeks after the delivery of the second certified check, First Software filed its Chapter 11 petition. In mid–May, it commenced the instant adversary proceeding. By letter dated May 24, 1986, counsel to Computer Associates, in response to the filing of the instant preference complaint, formally tendered the return of any and all goods that were recovered by Computer Associates. However, counsel also advised First Software that Computer Associates would seek "a judicial determination that these goods, upon their re-delivery to you, are and/or should be subject to restraint against sale at liquidation or at below market price."

Counsel to the Debtor responded to Computer Associates's offer to return the goods recovered by letter dated May 29, 1986. In rejecting the offer, Debtor's counsel stated:

> We are advised that those goods can be sold in the ordinary course with normal mark-ups; however, it also appears that the quantities involved are far above the stocking level management would consider reasonable should First Software handle these products. More important, management believes that it cannot profitably handle these products on a one-shot basis. In light of the events of the past few months, it appears impossible to salvage a constructive on-going relationship.

---

**1.** The Court notes that Michael Kirwin, Michael Hajjar and Rick Faulk were co-founders of First Software Corporation. Kirwin and Hajjar are no longer employed by the reorganized Debtor. Faulk assumed the role of president upon the filing of the bankruptcy petition.

With respect to the value of the product returned by First Software, Faulk testified that First Software could have sold the software at normal mark-ups of 8–10% over its cost in March, 1986. Additionally, Computer Associates, as evidenced by its credit memorandum dated March 28, 1986, agreed to credit First Software's account in the amount of $1,500,026. Despite the credit memorandum, Poznanski testified that the value of the returned product to Computer Associates was approximately 10% of the invoice price, or approximately $150,000. First Software in answers to interrogatories indicated that the value of the returned product as of May 26, 1986 was 50–75% of invoice amounts. First Software attributed the decline in value to the releases of upgraded versions of two of Computer Associates's most popular software products, Easy Business Systems and Supercalc III 2.1.

Poznanski addressed the decline in the value of the products returned by First Software in his testimony. Despite Poznanski's attempt to show that the returned products had not declined in value as much as First Software argues they had, the Bankruptcy Court stated that new releases on the market in May and June, 1986 clearly affected the salability of the products at issue here. The parties dispute the magnitude of the decline by May, 1986, but agree that today the programs are essentially worthless. The decline began shortly after the Debtor returned the products to Computer Associates in March, 1986.

In January, 1987 Computer Associates received a communication from C. Hall Swaim, counsel to the creditors' committee and the Disbursing Agent, in regard to settlement. The letter made reference to an attached statistical analysis of the payments made by First Software to Computer Associates between April 19, 1985 and January 19, 1986. After taking into account the "ordinary course of business" defense, based on the timing of the payments, Swaim indicated that Computer Associates has a maximum exposure of $296,295.68 (subject to further adjustments for an error which would have reduced the claim for the cash transferred to $46,295.86) in pref-

erence liability. Swaim offered to reduce the amount sought by 10% if payment was made promptly and threatened legal action if payment is not made. The Bankruptcy Court excluded the statistical analysis as an offer of settlement and irrelevant to the issue involved, i.e. Computer Associates' demand and use of certified checks. Computer Associates contends this evidence was wrongly excluded.

## II. Standard of Review

An appeal from a Bankruptcy Court is governed by Bankruptcy Rule 8013. Rule 8013 provides:

> On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy court's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

Rule 8013, therefore, mandates the application of the "clearly erroneous" standard of review with regard to findings of fact made by the Bankruptcy Court. However a District Court must review a Bankruptcy Court's conclusions of law de novo. In re Pizza of Hawaii, Inc., 40 B.R. 1014 (D.C. Hawaii) aff'd, 761 F.2d 1374 (9th Cir.1984); The Bible Speaks v. Dovydenas, 81 B.R. 750 (D.Mass.1988).

## III. Preferential Transfer as to Count II, the 8,700 Software Programs

A. The Bankruptcy Court Did Not Apply An Incorrect Legal Standard Or Abuse Its Discretion In Determining That Computer Associates Received A Preference With Respect To The Product Return Of The Software Programs.

Computer Associates argues that the Bankruptcy Court applied an incorrect legal standard under 11 U.S.C. § 547(b)(5) in determining that the transfer of software programs was a preferential transfer. In a proceeding to avoid a preferential

transfer, the trustee has the burden of proving by a preponderance of the evidence each of the elements prescribed in § 547(b) of the Bankruptcy Code. *In re Utility Stationery Stores, Inc.*, 12 B.R. 170 (Bankr.N.D.Ill.1981); *see Constructora Maza, Inc. v. Banco de Ponce*, 616 F.2d 573, 576 (1st Cir.1980). The absence of any one of the elements constituting a voidable preference negates the trustee's claim. *In re Thomas Farm Systems, Inc.*, 18 B.R. 541, 542 (Bankr.E.D.Penn.1982).

Section 547(b)(1) through (5) of the Bankruptcy Code provides that the trustee can avoid a transfer of property as a preference if the transfer is:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the Debtor before such transfer was made;

(3) made while the Debtor was insolvent;

(4) made:

(A) on or within ninety days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if:

(A) the case was a case under Chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

There are no disputed factual issues with respect to the first four elements of § 547(b) for the three transfers in question. Moreover, with respect to the two money payments totalling $450,000 the fifth element is not in dispute either. Therefore, it is § 547(b)(5), the fifth element of a preference, that Computer Associates argues was not proven as to the software return, Count II.

With regard to the return of the software, Computer Associates notes that § 547(b)(5) raises the question whether the transfer "enables such creditor to receive more" than it would in a bankruptcy proceeding. While recognizing that no authority exists construing these words, Computer Associates argues that the courts are to look to what the creditor received, as distinguished from what the Debtor lost, in the transaction in determining whether the creditor has been benefitted from the transfer. More specifically, Computer Associates contends that the proper measure of valuing returned property pursuant to § 547(b)(5) is the benefit to the creditor rather than the loss to the Debtor.

Computer Associates asserts that the value of the returned product to them was only approximately 10% of its invoice price, or $150,000, rather than the $1,500,026 as found by the Bankruptcy Court. Computer Associates argues that the product return merely enabled it to avoid the cost of "rerunning" the returned programs, the value of which was approximately $150,000. The product return did not give it the "means, power or opportunity"[2] to obtain $1,500,026 by reselling the product through ordinary distribution channels, since it had the ability and opportunity to make sales with or without the product return. Computer Associates admits, however, that it could have resold the returned programs through ordinary distribution channels. *See* Brief of Creditor Appellant, Computer Associates International, Inc., p. 17 (May 16, 1988). Consequently, if 10% is the correct measure, Computer Associates argues no preference can be proven since 10% is less than what would have been the liquidation value of the Software in a Chapter 7 proceeding.

■ The Bankruptcy Court's opinion, however, carefully analyzed and correctly rejected this argument. The Bankruptcy Court found that there was no agreed value of the property transferred, only controversy. As a consequence, the Bankruptcy Court decided it had to consider the evidence in the record. The Bankruptcy

---

**2.** Computer Associates cites Black's Law Dictionary and Webster's New Collegiate Dictionary for the definition of the term "enable," i.e., "to give power to something" or "to provide with the means or opportunity."

Court was persuaded by the credit memorandum in the amount of $1,500,026 and the testimony of Faulk and Poznanski. Poznanski unequivocally stated that Computer Associates could have resold the products soon after their return. In addition, Computer Associates voluntarily made no attempt to sell the products to other distributors.

The Bankruptcy Court found that it is axiomatic that what a willing buyer will pay a willing seller is the best indication of fair market value. The Bankruptcy Court also agreed with the Debtor's argument that if the product had not been returned, Computer Associates undoubtedly would have filed a proof of claim based on the invoice amount. In the Bankruptcy Court's view, the $1,500,026 sales price is a more reliable gauge of the products' value than Computer Associates's manufacturing cost, a figure, the Bankruptcy Court notes, that omits the important costs associated with the development and marketing of software products.

Some support for the Bankruptcy Court's decision is found in *In re Computer Universe, Inc.*, 58 B.R. 28 (Bankr.M.D. Fla.1986) (preference defendant received computer equipment worth $38,393 in exchange for the cancellation of an outstanding obligation in that amount for accounting services). There the Court noted that the defendant:

> suggested that the measure of damages should be limited to the cost to the Debtor of the equipment. Such recovery would be insufficient. The testimony at trial was that this figure did not include the sales commission that was paid, freight, or indirect selling and overhead expenses. The defendant is bound by its agreed valuation.

*Id.* at 32.

In this case, the Bankruptcy Court did not apply an incorrect legal standard under § 547(b)(5) of the Bankruptcy Code and was not clearly erroneous in determining the value of the Software programs to be $1,500,026. The Bankruptcy Court focused on the evidence in the record to determine the value of the property, and its conclusion was amply justified.

The second prong of Computer Associates's argument with respect to section 547(b)(5) is that it was error for the Bankruptcy Court to find that the Disbursing Agent had sustained his burden of proving Computer Associates's liability under § 547(b)(5). *See In re Utility Stationery Stores, Inc.*, 12 B.R. 170 (Bankr.N.D.Ill. 1981). Computer Associates argues that in order to have met this burden of proof with regard to the fifth element of a preference, the Debtor must introduce evidence as to the value to the Debtor of the goods returned to Computer Associates and the value of the dividend which would have been paid to Computer Associates if the Debtor had been liquidated. Computer Associates relies on *In re Handsco Distributing, Inc.*, 32 B.R. 358 (Bankr.S.D. Ohio 1983) and *In re Vann*, 26 B.R. 148 (Bankr.S.D. Ohio 1983) for the proposition that the value of goods usually connotes market value and not, as here, invoice or sales price.

Computer Associates argues the Disbursing Agent's proof as to value was inconclusive, since he relied on an allegedly "agreed value," when, in fact, there was no stipulation of value in this case. Computer Associates asserts the Disbursing Agent determined this value to be the amount of the original invoice or sales price, which also equaled the amount of the credit given to Debtor's account. Computer Associates contends the Disbursing Agent's use of sales price was misplaced because "there is no justification for concluding that sales price equals market value." *In re Handsco*, 32 B.R. 358, 360 (Bankr.S.D. Ohio 1983). Moreover, the Disbursing Agent failed to proffer any evidence of what a sale might bring in the market place.

The Bankruptcy Court, however, restated its finding that the value of the product returned on March 25, 1986, had a value of $1,500,000 on that date. The Bankruptcy Court found that although it is clear that the goods declined in value significantly by May 24, 1986 when Computer Associates retendered them to the Debtor, the burden was on Computer Associates to

rebut the testimony offered by the Debtor as to value of the product on March 25, 1986 and that it should have provided more than Poznanski's assertion that the value of the products to Computer Associates on March 25, 1986 was approximately 10% of invoice price.

Although not explained by the Bankruptcy Court, *Vann* and *Handsco* are distinguishable from the instant case. In *Vann* and *Handsco* the Bankruptcy Court ordered the return of the property in question because the earlier sales price was not indicative of market value as of the relevant date and there was no other evidence of market value. *See Vann*, 26 B.R. at 149, *Handsco*, 32 B.R. at 360. In the instant case, however, the value of $1,500,-026 which Computer Associates ascribed to the returned software on March 28, 1986, constitutes evidence of its market value on that date for Computer Associates evidently regarded that figure as appropriate for its own business purposes, before the instant dispute arose. If there was evidence other than Poznanski's self-serving estimate to show that Computer Associates contemporaneous determination of the market value of its product was incorrect, Computer Associates had the burden of producing it. It failed to do so. Thus, the evidence in the record is adequate to support the Bankruptcy Court's finding that the Disbursing Agent satisfied his burden of proof under § 547(b)(5). It was not clearly erroneous for the Bankruptcy Court to conclude that the Disbursing Agent had shown that the value of the returned software programs was approximately $1,500,000.

B. The Bankruptcy Court Did Not Abuse Its Discretion In Concluding That Value Rather Than Property Should Be Returned Under § 550 of the Bankruptcy Code.

Computer Associates argues that if a preference is found, the Bankruptcy Court erred in ordering the wholesale value of the product to be returned to First Software. Computer Associates contends that the Bankruptcy Court should have ordered the return of the product to First Software, since a judgment for value is appropriate only where the product itself has declined in value because of improper use, storage, or conduct by the preference defendant. Computer Associates also asserts, without reference to any legal authority, that where there has been a retender the Bankruptcy Court may not order a recovery of value. Computer Associates further argues that if the Debtor had not "willfully" refused to accept the retendered software it would have been restored to the position it would have been in if the product was never returned to Computer Associates.

Section 550 of the Bankruptcy Code governs allowable remedies when a preference is established under § 547(b). Section 550 provides in relevant part:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover for the benefit of the estate, *the property transferred, or, if the court so orders, the value of the property*, from—(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made.

11 U.S.C. § 550 (emphasis added). The Bankruptcy Code does not provide guidelines to aid a court in deciding when to order recovery of the value of property rather than the property itself. 4 Collier, *Collier's on Bankruptcy* § 11 550.02 (15th Ed.1987). It is simply within the court's discretion to determine whether a return of the value of property or return of the actual property is the appropriate remedy.

The Bankruptcy Court relied on *In re Computer Universe, Inc.*, 58 B.R. 28 (Bankr.M.D.Fla.1986) to support its holding that a money judgment is in this case the appropriate remedy, since the preferentially transferred property depreciated in value after the transfer. Collier also cites *Computer Universe* in support of the proposition that:

> When a debtor cannot be made whole by the return of property lost through an avoidable transfer because of the depreciation in value of the property, the court may enter a money judgment equal to

the property's value as of the date of the petition.

4 Collier, *Collier's on Bankruptcy*, ¶ 550.02, at 550–6 n. 6 (Supp. 15th ed.1988). Furthermore, the Bankruptcy Court reasoned that on March 25, 1986 there was nothing preventing Computer Associates from reselling the returned products for the approximately $1,500,000 it credited the Debtor. Since the products had depreciated in value by May 24, 1986, and are essentially worthless today, the Bankruptcy Court concluded that it would be inappropriate to order the return of products to the Debtor.

This court finds that the Bankruptcy Court did not abuse its discretion in ordering payment to First Software of the market value of the software programs as of March, 1986. Computer Associates had the opportunity to sell the software programs promptly for $1,500,000 on March 25, 1986, but failed to do so. It would be inequitable to permit Computer Associates to profit, at First Software's expense, from its own miscalculation or malfeasance.

IV. *As to Counts III & IV, the $450,000 Cash, the Bankruptcy Court Properly Excluded Certain Evidence on the Grounds It Constituted a Settlement Offer Or Was Irrelevant And, In Any Event, Exclusion Was At Most Harmless Error.*

■ With regard to Counts III and IV, Computer Associates acknowledges that the First Software checks for $200,000 dated March 25, 1986, and for $250,000 dated April 2, 1986 were preferences as defined by Bankruptcy Code § 547(b). It contends, however, that it should not be required to repay these amounts because these payments were made in the "ordinary course

of business" and, therefore, are protected by 11 U.S.C. § 547(c)(2). This is an affirmative defense and the burden of establishing it was on Computer Associates. Computer Associates asserts that it was improperly prevented from satisfying this burden by the exclusion under Fed.R.Evid. 408 of a letter from Counsel to the Creditors' Committee to all recipients of preference payments which, making certain assumptions concerning the "ordinary course of business" defense for all recipients, stated that First Software's preference liability relating to the two checks was $296,295.68. Computer Associates also argues that properly applying the standards for determining whether payments were in the ordinary course of business utilized in the letter, its preference liability is further reduced to $42,295.86. Computer Associates contentions are, however, incorrect.

■ The letter at issue, dated January 7, 1986 (although apparently written on January 7, 1987), was written by C. Hall Swaim, Counsel to the Creditor's Committee. The evidence indicates that an identical letter, except for attachments with calculations concerning each recipient, was sent to each potential defendant. The letter described a proposed statistical method for uniformly determining which of First Software's payments would be deemed "in the ordinary course of business."[3] It also offered a ten percent reduction of amounts owed to facilitate prompt settlements and repayments. It is evident that the uniform statistical approach was designed to induce potential defendants to compromise their preference liability without the need for time consuming, expensive, litigation focusing on the unique circumstances of each transaction. The letter's express purpose was "to encourage immediate payment and

---

**3.** The Swaim letter summarizes its method for classifying preference liability as follows:

The Committee's accountants first determined the periods of time between each invoice and payment made between April 19, 1985 and January 19, 1986. Using statistical analysis, an average payment time was calculated. They then calculated the number of days constituting one standard deviation from the average time of payment, and ascertained all payments made during the 90 day period

from January 19 to April 19, 1986 falling outside the time window defined by one standard deviation. All such payments were classified as presumptively preferential, provided that the other elements of the preferential transfer was present. Finally, they classified as out of the "ordinary course" all returns to vendors of goods which were not exchanges of defective products, stock balancing returns or similar transfers which would be expected in the usual course of business.

avoid the conflict over minor discrepancies ...." The offer was expressly made "subject to, and with the expectation of, court approval based on the anticipated benefit to all creditors of expeditious recovery of preferential transfers." It threatened legal action if the demanded payments were not promptly made.

Computer Associates did not make the $296,295.68 payment demanded by the Creditor's Committee. Expensive, time consuming litigation, focusing on the circumstances of the $200,000 and $250,000 payments, ensued. The evidence amply demonstrated those payments, made by certified checks issued following formidable threats by Computer Associates, were classic forms of payments not made in the ordinary course of business. *See e.g. In re Brenton's Cove Development Co.*, 52 B.R. 287, 292 (Bankr.D.R.I.1985) ("these facts fit the classic preference situation of a long overdue obligation, pressure exerted by the creditor and a lump sum payment made shortly before filing the bankruptcy petition").

The Bankruptcy Court correctly concluded that the Swaim letter was inadmissible under Fed.R.Evid. 408. Rule 408 proscribes admission of evidence of an offer to accept something in settlement to prove the invalidity of a claim or its amount. The Swaim letter was properly deemed a settlement offer and it was offered by Computer Associates to prove that the amount it had to repay First Software was less than $450,000. Thus, it was plainly within the ambit of Rule 408.

In retrospect it may be clear to Computer Associates that it would have benefited from the uniform, statistical method of establishing which payments were in the ordinary course of business utilized in the Swaim offer of settlement, rather than having that issue determined in litigation and decided on the particular facts concerning its transactions with First Software. Having rejected the settlement based on that statistical method, however, Computer Associates was not entitled to have the offer utilizing those general assumptions considered at trial. Rather, the sum demand-

ed of Computer Associates in the Swaim letter was the sort of statement made in negotiations, based upon assumptions not proved at trial, and intended to forestall costly litigation which Rule 408 makes inadmissible. *Derderian v. Polaroid Corporation*, 121 F.R.D. 9, 10–11 (D.Mass.1988).

Moreover, while the Bankruptcy Court may have been expansive in its alternative finding that the amount demanded in the settlement offer was "not relevant," Fed.R. Evid. 403 would have properly operated to exclude the letter even if Rule 408 did not. As indicated earlier, the letter is based on uniform, statistical assumptions made without reference to the actual circumstances of the transactions at issue here. The probative value of such evidence could have been deemed substantially outweighed by the risk of confusion inherent in consideration of that evidence. Thus, even if the letter might have been considered for some limited purpose under Rule 408, it could have properly been excluded under Rule 403.

Finally, in view of the compelling evidence of threats described earlier, it is plain that the $450,000 was not paid in the ordinary course of business and any possible improper exclusion of the Swaim letter was harmless error.

C. The Bankruptcy Court Did Not Abuse Its Discretion In Declining to Award Prejudgment Interest To First Software on Count II.

■ First Software argues the Bankruptcy Court erred in not awarding prejudgment interest on approximately $1,500,000 it is to recover on Count II, the claim concerning the software returned to Computer Associates. Prejudgment interest should be included as an element of damages when the amount of the claim is either liquidated or "reasonably ascertainable by reference to established market values." *Robinson v. Watts Detective Agency, Inc.*, 685 F.2d 729, 741 (1st Cir. 1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953 (1983). The court's prejudgment inquiry is reducible "to whether the demand is of such a nature

that its exact pecuniary amount was either ascertained or ascertainable by simple computation or by reference to generally recognized standards such as market price." *Id.*

In *Robinson* the Court of Appeals affirmed a decision that the prevailing plaintiff was not entitled to prejudgment interest where:

> The amount in dispute was not liquidated, there was no transfer of a definite sum of cash, and the parties did not and do not agree on the value of what was transferred. *See Palmer v. Radio Corporation of America,* 453 F.2d 1133, 1140 (5th Cir.1972). The evidence as to the value of the transferred property ranged [widely].

685 F.2d at 742. This description is equally applicable to the instant case. Thus, the Bankruptcy Court correctly concluded that First Software was not, as a matter of law, absolutely entitled to prejudgment interest on the value of the software at issue.

In *Robinson,* however, the Court of Appeals indicated that the jury nevertheless had discretion to award prejudgment interest. *Id.* In the instant case the Bankruptcy Court implicitly recognized it too had discretion to award prejudgment interest on the value of the software at issue. The Bankruptcy Court explicitly balanced the equities and found that such an award would unduly penalize Computer Software, which, among other things, had a good faith dispute concerning its preference liability. The Bankruptcy Court did not abuse its discretion in reaching this conclusion. *See, Blau v. Lehman,* 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403 (1962).

V. *Order*

For the foregoing reasons, the decision of the Bankruptcy Court is hereby affirmed.